I represent the Millers and the Tuffs. As the Court noted, the principle issue in both cases are identical. So I will use the time accordingly to argue both at once. The controversy in this case is the correct determination of the point in time that a transfer takes place where an employee exercises an employee stock option, pledges the stock, and does not have personal liability for repayment of the loan or borrowings that were used to purchase the stock. That is the question. The government's position is it takes place at the time of the exercise of the option. Ours is it doesn't take place until the employee is at risk. Let me make it clear. Mr. Miller and Mr. Tuff and their families aren't seeking any tax relief or reduction of any tax that they owe. They want to pay the full amount of the difference between the strike price and the gain at the time the shares were sold on margin call. Every penny due and at ordinary income tax rates. The key here is that this is a case of the first impression dealing with the subject of an application of the capital gains tax to these transactions. This is a case of statutory construction. It requires this Court to view the evidence and the interpretation of the statutes most favorably to the upholding of the purpose of the remedial statute. The purpose of the regulation that we rely upon is to prevent a shareholder, employee shareholder, who exercises his employee's tax option without his own money, using borrowed funds that he doesn't have to pay back, secured and collateralized by the stock purchased, that he should not receive capital gains treatment on any of his gain. And the way this works is this. As you know under rule 80 IRC 83, if the exercise is made on day one, market prices, fair market value is higher. There's ordinary income tax paid on the difference between the strike price and the fair market value. If the stock is then held for two years or whatever and then sold and there's more gain, that gain is taxed at capital gains rates. The additional gain. Yes, the additional gain. Now, before TR 83 dealing with this was invoked, someone could borrow the money to make the purchase, collateralize it with the stock, not have any obligation, any realistic obligation to repay the loan because the stock was pledged to secure its repayment, and thereby get the benefits of the capital gain treatment without having put anything at risk. It's a very fundamental concept of our tax law that capital gains treatment is given to those who put their capital at risk, who help our economy, who evaluate and help business move along. But it shouldn't be allowed to those who are just along for the ride and haven't put their own funds at risk. In this case, Mr. Tuff and Mr. Miller collateralized a loan from their broker to buy the stock. They had no risk of repayment or virtually none. I'll come to that in a minute. So you're here to pay more taxes? I'm sorry? You're here to pay more taxes? As this works. Well, you know, I'm sure opposing counsel will accept that. You don't need us for that. Well, here's the issue, Your Honor. For 30 years. It sounded so good up to now. I was going to suggest to me that counsel just step out there, cut a check and, you know, cut this out of the process. I don't want you to oppose this. I'm sorry? The government should not oppose this. For over 30 years, even now, with a dip or two, particularly in 2000, which gives rise to these cases, the market just generally continually goes up. And as a result of which, the government can collect more and more tax for people who didn't put their own funds at risk and exercised the employee stock option, because they can tax that at ordinary income rates. They're not limited to capital gains rates on the gain. Because you have a regulation that has requirements your clients didn't meet. You know, and for better or for worse, if they had made money, they would have been taxed capital, you know, they've gotten capital gains treatment, and they lost money. And, I mean, I don't see what your argument is. You know, you wish the regulation were written differently than it is. No, I don't. I ask this Court to adopt and apply the regulation. Let's look at the regulation. Let's look at it. Thank you. I'd like to go there. Well, let's look at it together. I'm sorry, Your Honor. Am I waiting for you? No, you go ahead. You just talk. But talk in terms of regulation rather than policy. Let's look at the language. Thank you. You want me to address thank you, Your Honor? Yeah. Let's talk. I mean, this is what it's about. We do law here, not policy. All right. Well, the Treasury regulation that's in question here is 1.83 in various subsections. Okay. Which subsection? 137? 183-3A2 to start with. As Your Honor knows, that says the grant of an option to purchase property doesn't constitute a transfer, so that's out of the picture. I'm sorry, 183-3A2. Yes. Yes, sir. I'm with you. Okay. It says the grant of an option to purchase property doesn't constitute a transfer, so that's out of the picture. Then they say, in addition, and here's the key language, if the amount paid for the transfer of the property, that's what was borrowed from the broker, is an indebtedness, which it is, secured by the transfer of property, which it is, the stock is pledged, on which there is no personal liability to pay all or a substantial part of the indebtedness, which is the case, the transaction may be in substance the same as the grant of an option. And then it goes into the criteria. And the example that I'd like to then address, which is Example 2 to 183-3A7, really ices this case as far as the plaintiff's position is concerned, in my opinion. The court, Example 2 gives it, says, it basically says, here's how this works. And in this case, the employer sells the employee 100 shares of stock in exchange for a $10,000 note. Well, a $10,000 note is payment in full, just as cash would be or a peppercorn. So it's paid for. And the note requires payments of $2,000 a month or, pardon me, a year. But this employee doesn't pay anything on the note. And he doesn't have any personal recourse against him, but he pledges the stock to security. He can collect dividends, vote the stock, pay interest on the note, pledge the shares. In other words, that's the case. Well, your client paid for the stock. Yes, sir. And he couldn't back out of it. No. Well, why, that isn't covered by Regulation A7, 183-A7, is it? Yes, sir. The example they have, the employee had the option to back out if he wanted to. No, no. Your Honor, I'm sorry, but that is mistaken. The employee – take the employer-employee situation. When the employer says, okay, I'm transferring the shares to you, you're giving me a promise-free note that's nonrecourse, and we're pledging the stock to secure that. That is a situation in Example A, which is just an example. It's not the only situation. But take that one. At that time, the employee gets full legal and equitable title. He can sell it. He can pledge it. He can collect dividends. He can vote it. And there's a full transfer, and the employer is fully paid. The employer has accepted a note in full payment. It's a complete transaction. The only issue in terms of whether or not transfers need to happen from tax purposes is, has the employee put his or her own funds at risk in this transaction? That's the whole thing that this is about. It doesn't matter if the loan is from the employer, a third party, an uncle. If there's not an obligation to repay that loan that is likely to be called upon, then it is considered to be a loan in which there is not personal liability to repay, and the person has not put their funds at risk, and, therefore, the transfer takes place only when they do put their funds at risk, like paying for the stock. Let's talk about the loan. Your client got the loan here? Yes, sir. From whom? In this case, the loan, in both these cases, the loan was from the broker, Your Honor. From the stockbroker, the money was borrowed by the employee to pay for the stock. From the stockbroker, the stock was pledged to secure repayment, and the margin call provisions made it virtually impossible that the employee would ever be called upon personally to repay the loan. You know, that word virtually is such a slippery word. Well, it's – Your Honor, remember, please, that the regulation itself says that the court shall look – I didn't say the court, but that the transaction may be in substance the same as the grant of an option. The determination of the substance of the transaction is based upon the facts and circumstances. Well, I understand, but there's a big difference between saying, you know, the employer says, I will lend you the money for the option, and you never have any obligation to pay it. We can't ever come after you. And having somebody like a broker make the loan, who has a right, after all, if the margin call does not satisfy the loan, the broker can – could have come after your client. Thank you, Your Honor. And respectfully, let me clarify that. First of all, the employer in accepting a note, that's payment in legal contemplation. He's got the note. He's been paid. He's transferred the shares that belong to the employee. The shares are pledged. The employee doesn't pay. It's the same thing with a broker. But money is borrowed from the broker. Money is – I'm sorry, paid to the – instead of a note, the money is paid to the – to the employer. Well, let's say that right about the time that the broker makes a margin call, the SEC suspends trading in the stock because it discovers that the company has been engaged in massive securities fraud. Contrary to fact here, this is hypothetical. I don't mean to cast aspersions on this company. But let's say they – trading is suspended for what turns out to be massive fraud. And it turns out when all is said and done, this is another – you know, some company that has committed some massive fraud. They never go back on the market again. The stock is down the toilet. And there's no margin call possible because the stock is not only no longer traded, but it's now worthless. Does the broker then say, thank you very much, Mr. Tuff. That was great to do business with you. We will eat what we lend to you. And, you know, even though you have a nice Lamborghini there and a very nice piece of property on Balboa Island and all that, we will just go away and leave you alone. Do you think that's likely to happen? That's the whole point. It is so remote that from a substantive – I understand. That's the nature of hypotheticals sometimes. So follow me along in this sort of scenario. And I realize that that kind of stuff never happens in America, but just absolutely never happens. But just humor me. Right. Let's say this, in fact, did happen. Yes. What would happen? What would the broker do in this case, you think? There is some remote chance of personal liability under the deficiency clause. But follow me along and assume the facts as I have hypothesized them. What do you think the broker would do? Do you think the broker would say, well, good doing business with you, give us a ride in your Lamborghini next time you stop by the bank for another loan. We'd love to sort of enjoy our money. I don't think so. I think what they would do is they would say they would hire a law firm and they would go after every piece of property that your client had and try to get that loan prepaid. That's the nature of business. I agree with you 100%. Banks and stockbrokers are notoriously unsentimental. Your Honor, I thank you, and I agree with you. Just like tax lawyers, I must say. Or at least those working for the government. I agree. There's no other answer to your conclusion. Of course they would do that. Okay. So why isn't that the case? What else is there to talk about? All right. Well, let me focus specifically on that particular element. The code does not require, nor does the regulation, that there be an absolute no risk. There must be, if there is not a substantial risk or a realistic risk of having to repay, it is treated in the law as I'm sorry. Where is that slippery wood? Well, Your Honor, page 40 of our brief, I believe. I prefer to look at the regulation. Oh, okay. Is it in the regulation? Yes, thanks. Let me go to that. Take your time. Take your time. Okay. All right. Here's the language. This would have been, again, in 183-382. It says, In addition, if the amount paid for the transfer of property is an indebtedness secured by the transfer of property, on which there is no personal liability to pay all or a substantial part of the indebtedness. Now, there is no personal liability as a practical amount, practical matter, if the stock has been pledged, there's a margin that is 133 percent, and there's margin call requirements because they, as in these cases, the margin call is made and it's sold. The court should not be governed by form over subsidies. Let me tell you how I read that language, and you tell me why I think it's incorrect reading, that it says, No personal liability means no personal liability, and that's an absolute term. And then it talks about personal liability and why. It says, Well, it has to be no personal liability either on an entire loan or a substantial portion of it. So, for example, if you have no personal liability on a quarter of it, but you have personal liability on three quarters of it, then you'd have personal liability. I understand that, and let me respond. That's how I read that language. I think that language, I think I wouldn't necessarily disagree with that. But here's the thing. It says, The determination of the substance of the transaction is based upon all the facts and circumstances. And the substance of these transactions is it was highly unlikely these people would ever be called upon to pay. And the Court needs to look beyond the form. Say there was a one-millionth chance. And let me – I've got two parts to this argument. Say there's a one-millionth chance you'd be called upon to repay this loan. Would the Court say, oh, well, but there is a chance, so bingo, you don't qualify, and the Court – and you can avoid – That's the problem with your interpretation. It is much easier to say, look, no personal liability. That is not a factual determination as to whether or not things will break the right way. But that is – you look at the document. You look at the instrument, and if the instrument says there is no personal liability, then you're home free. You don't have to hypothesize about whether companies will go out of business, whether they'll be suspended from trading or anything else. You look at the document. It says no personal liability. If it says there is recourse, we can come after you, then there is recourse. We don't have to engage in this kind of hypothesizing about what might happen. Respectfully, we do, Your Honor, and here's why. The – it goes on to say that determining this, you have to look at the – all the facts and circumstances. And when it calls upon – it calls upon the court to look to substance, not form. And the reason I'm asking you to adopt that interpretation is if you adopt the interpretation suggested by the trial court that there's a billionth chance that there's personal liability, if it says you're liable, we're not going to invoke this provision, which allows the government to claim ordinary income tax, and you're going to get the benefits of being a purchaser for value who put their own funds at risk. The reason for my argument is that the court is called upon to exercise statutory construction rules before it interprets the various ways this could be looked at to fulfill the remedial purpose of the code. If someone wanted to avoid – say you take – the employer says, look, I'm going to give you this. I'll take a note and take a pledge. And the employee says, look, I can borrow the same money from the broker and have a billionth chance of having a personal liability. But that little billionth, the court says, hey, that's okay. Now you get to have capital gains treatment because the transfer took place on the date of exercise of the option. Oh, I'm sorry. Excuse me. So the problem with the suggested analysis, by Your Honor, is that it allows emasculation of the purpose, the remedial purpose of the regulation, that is, that if you don't put your funds at risk, you're not going to get capital gains treatment. That interpretation, if there's any risk you'd have to repay at all, avoids the mandate of the – adopted that theory? Well, Your Honor – In a published opinion? Thank you, Your Honor. Under Section 465, which has to do with deductions, there's reams and pieces. They're all cited in our brief. And they go through detailed analysis saying, well, as a practical matter, if the repayment of the debt is guaranteed by a third party, then you're not really at risk. Or as a practical matter, if the shares are going to be sold on margin and there's a buffer there, you're not really at risk. Therefore, you can't claim the deduction. The same analysis applies – conceptually applies to this case, and should, because the Court is called upon to look at the substance of the matter, not its form, and because the Court is obligated to interpret this matter in a way that fulfills the remedial purpose of the regulation to prevent people from going around the side and getting benefit capital gains treatment who aren't really at risk. Well, the government says that this is really no different from a situation in which, as your clients did, cash is paid and the source of the cash is then a gift from the proverbial rich uncle. That is, there's no obligation to pay back the gift to the uncle, but the taxpayer, having paid cash, has not really paid for, as the regulation reads, gotten it – the transfer is an indebtedness secured by the transferred property on which there's no risk. So that basically what you're seeking to do, as I understand it, is to say, no, we'll call it that because it's nominally a non-risk situation, and that that part we have to read thoroughly. Is that – I'm simply characterizing it, as I say, as I read the government's red brief is doing. I think there's at least – I picked up two points there, Your Honor, if I may answer that. The first, if the nice rich uncle gives you money and you buy the – which is wonderful for the person. Actually, if he's given him the money, it's his money. He's put it – he's putting his money at risk in buying the stock, and, sir – The taxpayer is not. The taxpayer would be at risk if he paid for the stock, Your Honor. Is that – But pays it, buys it. And when you buy stock for – when you buy – when you exercise the option by paying for it in cash, that's the event, right? Oh, yes. That's the transfer. I wholly agree. But if there's no – if you have a loan and there's no obligation to repay it, and there's no obligation to repay this gift, that's an entirely different situation because then the employee has the money. It's his money. It's been given to him. He's putting it at risk. But if the money is borrowed and there's no obligation to repay it or there's a practical matter there isn't, that's where this Court is called upon to look at the practicality of it. Thank you. You are – you are over your time. Oh, I'm sorry, Your Honor. Thank you. I – I – We'll give him the government. Okay. Thanks. May it please the Court. I'm Mike Hoggs from the Justice Department. I think the fundamental problem here is that the taxpayers' arguments about recourse versus nonrecourse debt are both wrong but more fundamentally irrelevant because they overlook the crucial language of the regulation. And that would be in Section 1.83-3A2 under option. It says, in addition, if the amount paid for the transfer of property is an indebtedness secured by the transferred property, that's not what happened here. He didn't pay with an indebtedness. He borrowed money from a broker in a third-party transaction. But as we said in the brief, it doesn't really matter to Microsoft or the real networks. It doesn't matter to the employer whether he borrowed the money from his uncle or from his broker or whether it's a gift or it's from his wife or wherever. The company got paid cash. And at that point, the risk of loss in the stock transferred to the employee, and that's the whole point of this regulation and this statute. At that point, the stock belonged to the employee. And that's actually illustrated by Example 2, on which they rely so heavily. In Example 2, it says when the W sells 100 shares of stock for a fair market value in exchange for a $10,000 note, that's not payment. A note is not payment. That's a promise to pay. And the point of Example 2 is that the employee in that situation is able to walk away from that transaction with no harm. That's why it's essentially a grant of an option or a continuance of an option. What if this were a third-party loan where he truly could walk away? Let's say it didn't come from his uncle. It was truly nonrecourse. Yes. This regulation still wouldn't come into play because as to Microsoft or real networks, it has already been paid. It has cash. It doesn't have anything at risk anymore as to the stock. The entire risk has transferred to the employee. And if it does happen that he got the money in some nonrecourse fashion. What about those cases, those many cases that the Board of Counsel cites where he says in the case of where the taxpayer seeks to get capital gains treatment, the service has gone back and recalculated? Those are all cases involving the employer? I'm not sure which cases.  I thought I heard him say 465. I'm sorry, 465. That's a different issue. It does not have to do with stock options. It has to do with deductions. I mean, there certainly is a line or a number of lines of cases in which the service can look at the economic reality of certain kinds of transactions where people are kind of manufacturing a transaction to avoid taxes. But that's not the case. That's essentially what counsel is arguing happened here. That it's essentially a contrived loan. It's really not a loan because effectively it will never have to be repaid. And that's what I said, you know, I'm trying to pay more money to the government. I mean, basically he's saying we engaged in a sham. And if we had come out on the other end of this transaction, made money, then the service would be coming after us and trying to restructure the transaction and say you didn't have anything at risk, you don't get capital gains treatment. And, therefore, since we're on the other side, we ought to be treated the same way. I don't think that that's correct. I think, in fact, this regulation, this policy generally does favor taxpayers in a rising market. I mean, the reason that we're here in this litigation is because these particular taxpayers unfortunately lost money on these transactions. But this basic rule that people, they keep talking about this policy. But let's follow up on the question I was asking you. Let's say this were exactly the same transaction, structured exactly the same way. Let's say they had, in fact, I mean, in fact, it is this transaction. It is this loan and this arrangement. The market does well. And instead of losing money, they went ahead and they made money. Right. And they treated it as capital gains. Right. Right, because they exercised the option that was priced for them. And would the IRS be entitled to come back and say, no, no, this is ordinary income, because when we analyze the transaction, you really had nothing at risk. Look at this. There was hardly a chance at all that you'd ever have to pay the loan. You really should pay ordinary income. No. The IRS would not be taking that position. In fact, my understanding is that's what people would do. The question is not whether it would. The question is whether it could. No. Under this regulation, they could not. You see the point, right? There's a certain symmetry. That's what counselors argue. There's a certain symmetry. We should be, since they believe the IRS could come after them if they think differently, they should be able to come after ourselves, so to speak. And you're saying they couldn't do it and the IRS has never done this. To my knowledge, it hasn't. I don't think they've cited anything that I've seen where the IRS has done that.  Because the transfer takes place. But if the loan were from the company, you would, certainly, right? If it were a non-recourse loan from the company, yes. Then this regulation would come into play. Let's say this were a non-recourse loan from the same transaction as here, but it was a third-party non-recourse loan. Okay. They've got their stockbroker, but it's just there is no clause in the agreement that says there's no recourse. It's hypothetical, so you can assume whatever you want. Right. So the thing, there is no recourse. They borrow the money not from the employer, but from a third-party. The employer gets paid, so the risk, the employer no longer has an ask at all. But then, essentially, the risk is shifted to this third-party. And I would say that that is irrelevant to the tax code because, as I think Your Honor just said, the employer that issues the stock no longer has any risk. The risk is shifted to the employee, and if the employee is able to lay that off on a third-party, be it an uncle, be it a stockbroker, whatever, that doesn't really matter from the standpoint of the tax code, which is looking at did the ownership interest transfer from the employer to the employee. And under that hypothetical, even if it's non-recourse third-party debt, yes, the risk of loss is no longer with the employer. It's with the employee or with the employee's third-party lender. And that's between them. I think there are no cases dealing with that particular scenario. We've got a third-party lender. Correct. And I think the way it always works, it's the employer who does the sweetheart deal because this is a way for the employer, who is somewhat controlled by the tax code, maybe a principal, tries to work in such a, you know, makes a sweetheart deal loan, including a sort of non-recourse loan because it's a way of shifting a benefit to the employee. I see. So that's the risk that you're trying to account for here, that the employer will have an incentive to take this risk of a non-recourse loan because it's a way of compensating an employee, whereas a third-party would only do it in highly unusual circumstances, not in any commercial circumstances. As Your Honor observed earlier, yes, that would be an extraordinary stockbroker that would enter into that kind of an arrangement. And does it make a difference whether the employer did or did not facilitate the arrangement under which the non-recourse loans were made by the broker? I don't see how that has any real bearing on it. I think in these kind of option plans, it's usual that the companies are working with some kind of a stockbroker just to facilitate the mechanics, but it doesn't make it. Again, it goes back to the shifting of risk because even if Microsoft or Real Networks is working with a broker. Your position is that if the employer does it, the employee is dead in tax terms, right? If the employer, yes. Yes. And my question of you is, does it make a difference then if instead of the employer doing it, the employer has made the arrangement with a friendly broker to engage in the transaction? And in your hypothetical, is it a non-recourse or a recourse loan? Yeah, a non-recourse. Oh, it's a non-recourse loan. Yeah. I guess we – possibly we could get into the facts and circumstances in that kind of a situation, but that doesn't seem to apply to the literal language of the regulation. I guess it might depend on why the broker was so friendly with the employer. If there was other business going on or the employer was really secretly covering the loan. I don't know of any brokers that are that friendly with anybody. Yes. I would agree. I mean, but that would be the suspicion. The suspicion there is that if the broker does something like that, maybe they're being backdoor compensated. It's a business list. Yes. Somebody has to pay for the business list, and if the employer is in such good terms with the broker, the broker is willing to do this, then presumably the broker is getting something else back from the employer. Yes, although I guess in that situation, like I said, this regulation really looks at when was the risk of loss on these shares of stock transferred from the employer to the employee. So in that situation. That's right. But if the broker gives a nonrecourse loan, and the understanding is that the employer will cover it through the backdoor. Then the risk hasn't transferred in that situation. It hasn't transferred. Yes. So then we're really back to the situation where it's the broker, where it's the employer doing it directly. Yes. Okay, Mr. Harris. Thank you very much. All right. Thank you very much. Thank you for your time. We'll give you a minute for rebuttal. Thank you. Risk of loss is a very interesting concept here, and I actually didn't get to addressing it. Under the example two that we've all been through, it ends with the words, therefore, no transfer occurred on November 17th, but an option to purchase the stock has been granted.  It's a fiction. It's a fiction established by law to protect the capital gains treatment and to restrict it to those who put their funds at risk. This gets us to the risk of loss. An option holder does not bear the risk of loss of the property he or she has not acquired. They can spend the money, put their risk in. They can walk away. It's an option. There's no risk. And under the fiction here, there's been no shift of risk of loss because there is an option to purchase the stock has been granted. The purchaser, the shareholder, now is an option holder in the eyes of the law. An option holder doesn't bear the risk of the ups and downs of the marketplace and property they don't own. If a contrary view were taken, that would again emasculate the statute. It wouldn't work. I think we do understand your position. Your time is up. I appreciate it. Thank you very much, Your Honor, for the additional time. The case just argued, or the cases, rather, just argued, will stand submitted.
judges: Goodwin, Kozinski, Shadur